THE CENTRAL RAILROAD COMPANY OF NEW JERSEY,
PETITIONER-APPELLANT, v. DIRECTOR, DIVISION OF
TAX APPEALS OF DEPARTMENT OF TREASURY OF
STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued September 10, 1951—Decided October 1, 1951.

16

Mr. *James D. Carpenter* argued the cause for the appellant; *Messrs. Carpenter, Gilmour & Dwyer*, attorneys; *Mr. Judson C. McLester* of the New York Bar and *Mr. Milton A. Dauber* on the brief.

*Mr. Benjamin C. Van Tine*, Deputy Attorney-General, argued the cause for the respondent; *Mr. Theodore D. Parsons*, Attorney-General, attorney.

The opinion of the court was delivered by

OLIPHANT, J. This is a railroad tax case which involves essentially the construction of *R. S.* 54:29A–2.

The appeals, which were taken to the Superior Court, Appellate Division, and certified here on our own motion, are from judgments of the Division of Tax Appeals, Department of the Treasury, which affirmed the franchise tax assessments against the Central Railroad of New Jersey made by the Director of the Division of Taxation for the tax years 1948, 1949. and 1950. The assessments were made pursuant to the provisions of the Railroad Tax Law of 1948, *L.* 1941, *c.* 291, as amended by *L.* 1942, *c.* 169, and further amended by *L.* 1948, *c.* 40, *R. S.* 54:29A–1 *et seq.*

As was pointed out in *Norton v. State Board of Tax Appeals*, 134 *N. J. L.* 57 (*E. & A.* 1946), and again in *Delaware, Lackawanna & Western Railroad Co. v. Division*

*of Tax Appeals,* 3 *N. J.* 27 (1949), the tax levied on railroad property had for years been continuously in litigation and such litigation still continues.

Previous to 1941 there was a straight property tax on Class I and Class III railroad property the proceeds of which are applied to uses of the State. That tax was computed upon the entire assessed valuation of such property at the average rate of taxation in the State for such year. (*R. S.* 54:24–2.) The average rate was upheld in *Central Railroad Co. of New Jersey v. State Tax Department,* 112 *N. J. L.* 5 (*E. & A.* 1933), *certiorari* denied 293 *U. S.* 568 (1934), 55 *S. Ct.* 79, 79 *L. Ed.* 667. In 1941 a new method of taxing such property was enacted, *L.* 1941, *c.* 291, amended in 1942 by *L.* 1942, *c.* 169, which in substance provided for a combination property and franchise tax computed in a given year on the basis of the net operating income of a railroad system for the preceding calendar year.

By the Constitution of 1947 it is provided that all real property assessed and taxed for allotment and payment to local taxing districts shall be taxed at the general tax rate of the taxing district in which the property is situate, *Art. VIII, Sec. I, par.* 1. It therefore became necessary to amend the Railroad Tax Law to provide for a straight property tax at the local rate upon Class II railroad property. This entailed a substantial increase in such taxes and the Legislature amended the Railroad Tax Law to provide drastic reductions in Class I (main stem) and Class III (tangible personal property) railroad property and in the franchise tax, *L.* 1948, *c.* 40; *R. S.* 54:29*A*–23. This resulted in average total tax assessments for the years in question on Class I and Class III property of $452,541.34 and franchise taxes of $301,073.67. For those years the assessed value of that property averaged $42,144,192 and the percentage of the total combination property and franchise tax to property valuations for such years averaged 1.788 per cent.

The appellant seeks by these appeals to have its franchise tax assessments reduced to the statutory minimum of $4,000.

In short it seeks to limit its combination property and franchise tax assessments to substantially the amounts assessed on its Class I and Class III property for the years in question.

If this appellant should be required to pay only the statutory minimum franchise tax of $4,000 *per annum* then the total average assessment for the years in question would constitute only 1.07 per cent of its Class I and Class III property.

It must be remembered that the new method provided by the Legislature for taxing railroad property used in transportation service in this State was designed to give some measure of relief to the railroad companies in poor earning years and it gives the State an additional return in good earning years. *Delaware, Lackawanna & Western Railroad Co. v. Division of Tax Appeals, supra.* The record here shows conclusively that the years in question included "good earning years" under the formula devised in 1941.

As pointed out above, the Class I and Class III property of appellant under the straight property tax law would have been subject to tax at the average rate of taxation. For the year 1948 this would have been 5.90 per cent, for 1949—6.139 per cent, and for 1950—6.201 per cent. At such rates the tax would have been as follows, for 1948—$2,583,939, for 1949—$2,528,554, for 1950—$2,556,746.

It is quite obvious that the combined property and franchise tax as levied was but a fraction of the tax that would have been levied under the old straight property tax law upon Class I and Class III property. Since the record discloses a clear legislative intent to prevent the use of accounting practices which would allow further unintended deductions and since legislation must be accorded a rational interpretation consistent with its manifest purpose, *Grobart v. Grobart,* 5 *N. J.* 161 (1950), a construction should not be adopted that would lead to such further drastic reduction unless it can be shown the words of the statute clearly so require or the application of the recognized rules of construction leads to no other conclusion. Not only can this not be shown but, on the contrary, the language of the statute and

the rules of statutory construction leads us to the conclusion that the Legislature never intended the construction urged here by the appellant.

We reaffirm what was said in the *Norton* and *Delaware, Lackawanna & Western* cases. The Railroad Tax Law of 1948 constitutes a new method of taxing property located in New Jersey and used in the furnishing of transportation service in this State. The law provides a combination property and franchise tax computed in a given year on the basis of the net operating income of a railroad system for the preceding calendar year. The justification for the tax is the presence in the State of Class I and Class III property of great value, which is essential to system operations. As a measure of the amount which must be paid in tax upon such property used on system operation, the Legislature has fixed a very low direct property tax to which has been added an additional amount to be determined by the results of such system operations, the total being far below the former straight property tax.

*R. S.* 54:29*A*–13 provides:

"An annual franchise tax is hereby levied upon all railroads operating within this State, which shall be assessed at the rate of ten per centum (10%) upon the net railway operating income of the preceding year, computed and allocated in the manner hereinafter provided, of each system and of each railroad not part of a system subject to the maximum and minimum provisions set forth in section 20 (c) hereof, *L.* 1941, *c.* 291, *p.* 777, § 13, as amended *L.* 1948, *c.* 40, *p.* 116, § 5."

The present dispute concerns what the Legislature meant by the word "system."

*R. S.* 54:29*A*–2 provides the following definition of the word "system":

" 'System' means any independently operating railroad which operates its facilities and those of one or more other railroads as a single utility for furnishing transportation service. A system shall include all companies the property of which is so operated either by virtue of control through direct or indirect ownership of a majority or more

of capital stock, or under lease, trackage rights or under any other form of contract, and for which separate operating accounts are not maintained."

The different contentions of the parties are that the State says the Legislature was concerned with the actuality of the use of the properties of the appellant in New Jersey and Pennsylvania as a single utility for the furnishing of transportation service while the appellant maintains that, notwithstanding the properties may be used in such manner from the standpoint of physical operation, the legislative intention was to exclude a portion of an otherwise proven system because of the manner in which it keeps its accounts.

The Railroad Tax Law also provides by section 11 that "Taxes assessed pursuant to this act shall be in lieu of all other State or local taxation of or measured by property taxable hereunder, other than assessments for benefits," and by section 12, "Property taxable under this act shall be assessed by the commissioner to each system and to each railroad not part of a system by which such property is used for railroad purposes. . The assessment shall be made in the manner hereinafter provided."

The statute mentions only two situations: (1) a system operation and (2) an independently operating railroad which is not a part of a system. No provision is made for the levying of a tax on a part of a proved system.

The Lehigh Coal & Navigation Company, hereinafter referred to as the Coal Company, owns and has at all times in question owned all of the lines of the appellant located in Pennsylvania except a very few miles of branch line. For many years prior to 1941 the appellant leased this property from the Coal Company and operated it as the Lehigh & Susquehanna Division.

It is interesting to note that in 1942, the trustees in reorganization of the appellant appealed its franchise tax assessments claiming that divisional accounts of the Lehigh & Susquehanna Division were the separate operating accounts intended by the Legislature and that such accounts must be

excluded in determining the franchise tax base upon which the franchise tax assessment was calculated. The State Board of Tax Appeals dismissed the appeal, *In re Pitney,* 20 *N. J. Misc.* 448, 474 *(B. T. A.* 1942), holding that the Legislature did not intend to limit the meaning of the first sentence of the definition as contained in *R. S.* 54:29A–2 by the second sentence thereof. The former Supreme Court granted *certiorari* but the appellant withdrew its appeal and similar appeals for 1943 and 1944 in December, 1945. *State v. State Board of Tax Appeals,* 134 *N. J. L.* 34 *(Sup. Ct.* 1946).

In 1939 a Mr. William Wyer made two studies of the properties of the appellant, particularly as to the operation of those in Pennsylvania, one a segregation study whereunder revenues were apportioned to designated parts of the system and the other a severance or separation study which went into the question of what would happen if the New Jersey and Pennsylvania properties were actually operated separately. These studies showed large profits were being earned by the lines in Pennsylvania and large deficits were occurring from the lines in New Jersey and the plan to separate the lines was formulated. Mr. Wyer testified in this case that if there was actual separate operation of the lines in the two states there would be traffic shifts and that a substantial loss of income would result to both operations. He went on to say, with respect to the contemplated set-up, hereafter to be alluded to, "We didn't anticipate that the total revenue of the Central Railroad Company of New Jersey and the Central Railroad Company of Pennsylvania would be any different than the revenue formerly received by Central Railroad Company of New Jersey." From the very beginning it is apparent that any separate and independent operations envisaged by the "separation study" were not contemplated—that the plan never contemplated the arms' length bargaining of two separate and wholly independent operating companies.

In furtherance of the proposed plan for the separation of the lines in Pennsylvania and New Jersey the name of a wholly owned subsidiary of the appellant, the Easton & West-

ern Railroad Company, a Pennsylvania corporation, was changed to the Central Railroad Company of Pennsylvania, hereinafter referred to as C. R. P., and the appellant began negotiations with the Coal Company regarding the transfer of the leased properties in Pennsylvania to the C. R. P. In his studies Mr. Wyer spoke of the advisability of assigning the lease of the Coal Company properties, whereby the appellant would be relieved of all liability thereunder, but he testified the appellant was not successful in this respect. On the contrary, the agreement between the appellant and the Coal Company granting approval of the sublease relieves in no respect the liability of the appellant under the original lease; the appellant remains bound as heretofore. In addition, by that agreement the appellant has covenanted to maintain the continuity of its main line of railroad from the state line to the important New York terminal area. Also the agreement, to which the C. R. P. was not even a party, provides that there shall be only a single division of through rates between the Jersey Central Lines (appellant and C. R. P.) and connecting carriers which shall be further subdivided between appellant and C. R. P. according to a formula agreed upon by the appellant and the Coal Company. In short, the arrangement with the Coal Company cannot be said to have contemplated separate operations. On the contrary, the arrangement, insofar as the furnishing of transportation is concerned, contemplated the continued operation of the Pennsylvania properties as part of the Jersey Central System as heretofore.

Thereafter the proposed form of agreement between the Coal Company and the Central Railroad Company of New Jersey, hereinafter referred to as C. N. J., and the sublease to the C. R. P. were prepared. This agreement also evinces a plan not to maintain separate operations of two truly independent operating railroads. The provision for the maintenance of depreciation accounts and those for the payment of *per diem* car hire by the C. N. J. on its own equipment are but two factors showing that true separate and independent operation by the two companies was never contemplated.

The United States District Court, on petition of the appellant, approved the sublease of the Pennsylvania lines of the appellant to C. R. P., the making of the agreement with the Coal Company, which among other things fixed the division to be received by C. R. P., and the establishing of C. R. P. as an operating company, subject to the further approval of the Interstate Commerce Commission. That commission found that the "sublease of the lines in Pennsylvania from the trustees to the applicant (C. N. J. to C. R. P.) would result in no change in train service. * * * The trains would operate just as they do today * * *"; and that with respect to the important coal movements, the great part of which come into the State of New Jersey, "the system function of the facilities would be precisely the same whether the movement in Pennsylvania to the Delaware River were begun and carried on in the name of the trustees (C. N. J.) or in the name of the applicant." (C. R. P.)

Concerning the proposed accounting the Interstate Commerce Commission report said:

"One of the benefits claimed for the proposals herein is that the trustees will not have to carry two separate sets of accounts, yet the trustees and the applicant (C. R. P.) would have separate books."

Thus the evidence is persuasive that even before any purported separate operations were undertaken from the standpoint of furnishing transportation service the appellant always intended to operate the Pennsylvania properties exactly as such properties were then being operated as the Lehigh & Susquehanna Division of the C. N. J.

The alleged separate operation of the two companies began on August 5, 1946. On that day all foreign lines were notified that all settlements with "Jersey Central Lines" would be subdivided between C. R. P. and C. N. J. according to a table. All division agreements continued to be those of a single entity, the "Jersey Central Lines." The two companies were known and advertised as a single operating entity, the "Jersey

Central Lines." The Division of Tax Appeals pointed out below that:

"One of the appellant's own witnesses who testified that he originated the term, stated that it embraced 'all of the railroad companies operated or controlled' by C. N. J. Another witness stated that Jersey Central Lines, and we quote, 'is more or less in the nature of a trade name, which identified * * * the Central Railroad Company of New Jersey and the various railroads that form part * * * of the system.' The record goes so far as to reveal the rather small detail that even the telephone number of C. N. J. may be found under the listing 'Jersey Central Lines.' Additionally, form cards interchanged with foreign roads relating to car interchange were headed by the same general description."

■ The record discloses that what the Interstate Commerce Commission foresaw in fact materialized—that train service upon the lines is run in exactly the same manner as when the lines of the present C. R. P. were the Lehigh & Susquehanna Division of the C. N. J., and we agree with the Division of Tax Appeals that the record leaves no doubt as to the manner in which the properties are operated. The proof is clear and convincing that the appellant operates its Class I and Class III property in New Jersey and the leased property of the Coal Company as a single entity for the furnishing of transportation services. Thus the appellant operates the properties in Pennsylvania as a part of a system within the meaning of the first sentence of the statutory definition.

■■ The appellant argues that the operating accounts proviso of the second sentence of the definition was intended to exclude a railroad which otherwise would constitute a part of a system. With this we cannot agree. As stated, the purpose of the act was to provide a combination tax in lieu or substitution of a straight property tax predicated upon the use of property in this State. If the plan or device used by this appellant can be permitted then the very purpose sought to be attained by the act can be destroyed at the will of the tax-paying railroads. That this could not have been the legislative intent is shown by Exhibit CR-4, the "Report on

Railroad Taxation" by the Joint Legislative Committee made in 1941, in which appears the following: "In considering and drafting the franchise formula every precaution has been taken to render it as nearly impossible of evasion as it could be" and "Because of the suggested reduction in rates at which railroad property is liable to taxation, the Committee does not feel justified in recommending any alterations resulting in further reductions in future tax liability."

It is a cardinal rule of statutory construction that legislation should be construed so that, if possible, full force and effect shall be given every sentence, clause and word thereof. *Steel v. Board of Chosen Freeholders of Passaic County*, 89 *N. J. L.* 609 (*E. & A.* 1916); *Bogert v. Hackensack Water Co.*, 101 *N. J. L.* 518 (*E. & A.* 1925); *Oldfield v. New Jersey Realty Co.*, 1 *N. J.* 63 (1948).

The construction claimed by the appellant would result in a tax upon a part of a system. As pointed out above the statute provides for a tax to be assessed to each system and to each railroad not part of a system. *R. S.* 54:29A–12. A franchise tax is also levied upon the net operating income of the preceding year of each system and each railroad not part of a system. *R. S.* 54:29A–13. There is no provision in the law for the taxing of part of a system. There was no legislative intention to exclude any part of a system by the second sentence of the definition. Thus only can full force and effect be given to every sentence, clause and word of the Railroad Tax Law as required by the rule of the *Bogert, Steel* and *Oldfield* cases, *supra*.

As stated, appellant argues that the second sentence of the definition was intended to exclude a company in the position of the Central Railroad, although otherwise it might be held to be a part of its system. The intention of the Legislature as expressed in a statute should be ascertained and given effect. *Norton v. State Board, supra*. The words "for which" obviously refer to the clause "all companies the property of which is so operated." In the instant case this means the Lehigh Coal & Navigation Company whose property is

operated by the Jersey Central Lines. There is nothing in the record or the legislative history of this legislation to support the premise that this portion of the definition was intended to include a situation where a taxpayer would operate its own property through a wholly owned subsidiary and thereby escape tax liability.

No limitation or exclusion was intended by the second sentence of the definition. If it was intended to narrow or limit the broad language of the first sentence or exclude any part of a proved system, then inept language was used for that purpose. As was said in *State of New Jersey v. Rosecliff Realty Co.*, 1 *N. J. Super.* 94 (*App. Div.* 1948), "The verb 'include' has not been defined so as to give it such a restrictive meaning." See also *Baker v. Sollau*, 94 *N. J. Eq.* 544 (*E. & A.* 1923) and *Snegon v. Consolidated, etc., Ins. Co.*, 117 *N. J. Eq.* 325 (*Ch.* 1934).

Also the word "separate," as it refers to operating accounts, does not, in our judgment, have the meaning attributed to it by the appellant—that it refers to accounts covering operations which, while unified in fact, are technically separate. "Separate" means individual, disconnected, divided, not united or associated. *Black's Law Dictionary; Webster's New International Dictionary, 2d edition*. The accounts in question are neither individual nor disconnected; they reflect the single result of a single, unified operation. We reach this conclusion from the record of actual operations as well as the finding of the Interstate Commerce Commission that the appellant "will not have to carry two separate sets of accounts yet the trustees and the applicant (C. R. P.) would have separate books." Also, in actual operation some of the books, such as car hire books, were not kept separately but kept together just as any other system operation.

The true meaning of any clause or provision of a statute ordinarily is that which best comports with the subject and general object of the statute. *Maritime Petroleum Corp. v. City of Jersey City*, 1 *N. J.* 287 (1949). It would seem just ordinary common sense that, if there be in fact a single

system operation, there could be but a single set of operating accounts for such single operation, no matter how many sets of books or divisional accounts might be kept. Such was the legislative intent; the whole definition must be read together. If an independently operating company actually operates its own facilities and those of one or more other companies as a single entity for furnishing transportation services, then the latter company or companies is or are a part of the system. No exclusion was intended by the latter part of the second sentence. That clause was intended to assure that there would not be included, because of the manner of control, any railroad which on its own part is a truly separate and independent railroad from the standpoint of furnishing transportation service. The clause means the separate operating accounts of a railroad which is truly separate and independent from the standpoint of furnishing transportation service.

With particular reference to the instant case we also find that the C. R. P. is in all things save its intangible and unsubstantial corporate entity the C. N. J. The stock ownership of C. R. P. is one hundred per cent in C. N. J. Under such circumstances even the books of the C. R. P. are not separate books but those of this appellant, the C. R. P. being a mere *alter ego* of the C. N. J. *Stockton v. Central Railroad Co. of New Jersey,* 50 *N. J. Eq.* 52 (*Ch.* 1892).

As we pointed out in *Delaware, Lackawanna & Western R. R. Co. v. Division of Tax Appeals, supra,* "It was the legislative purpose to have the State share with the railroad companies in good earning years and the purpose is only accomplished if we determine the true net operating income (for each system) for each respective accounting period." The definition in question was intended to be of aid to the Division of Taxation in the accomplishment of that objective. It was not intended as a means of defeating such purpose. It is apparent that, if the appellant were to prevail on this appeal, there will henceforth never be any "good earning years" for it insofar as the State of New Jersey is concerned from a tax revenue standpoint.

Since the new method of taxing railroad property was adopted in 1941 the state taxing authorities have consistently interpreted the statute as not intending any limitation by the second sentence of the definition. When the amendment of 1948 was adopted the language in question was left exactly the same. The State contends that the appellant is estopped to deny the interpretation given to the language of the statute by the State Tax Commissioner because of certain representations made on behalf of appellant when the 1948 amendments were before the Legislature. We need not decide this point but such facts are persuasive that when the Legislature had the matter before it in 1948 it was fully aware of the administrative construction and was in accord that such was the correct interpretation of the law. *Ford Motor Co. v. New Jersey Dept. of Labor & Industry,* 7 *N. J. Super.* 30 (*App. Div.* 1950); 2 *Sutherland Statutory Construction, par.* 5105 (3*d ed.* 1949). Also in the *Norton* case, *supra,* the court pointed out that the Director was given broad power to assure that the true net operating income would be determined. We held in the *Delaware, Lackawanna & Western* case, *supra,* when the Legislature amended the Railroad Tax Law of 1948, that it must be assumed it acted with this judicial construction in mind.

The appellant says the statute as construed and applied by the Division of Tax Appeals violates the commerce clause and the equal protection and due process clauses of the 14th Amendment of the Federal Constitution. It made the same claim in its appeal from its 1946 franchise tax which we decided against the appellant in *Gardner, Trustee v. Division of Tax Appeals,* 3 *N. J.* 27 (1949). An appeal was taken in that case to the United States Supreme Court, which was dismissed on the State's motion. *Central Railroad Company of New Jersey v. Division of Tax Appeals,* 338 *U. S.* 946 (1950), 70 *S. Ct.* 488, 94 *L. Ed.* 583.

Appellant has placed great reliance in its argument that the statute violates the commerce clause of the Federal Constitution upon *Spector Motor Service v. O'Connor,* 95 *L. Ed.*

573 (1951). This case dealt with the imposition of a state tax "upon the privilege of carrying on a business that was *exclusively* interstate in character." In the case before us the appellant maintains Class I and Class III properties in this State in connection with the furnishing of both intrastate and interstate commerce. The Supreme Court held in the *Spector* case that the State is not precluded from imposing taxes upon other activities or aspects of a business which, unlike the privilege of doing interstate business, was subject to the sovereign power of the State, and that those taxes may come out of funds derived from a taxpayer's interstate business, provided the burden is reasonably related to the powers of the State and non-discriminatory. Nothing contained in this opinion gives even color of support to the contention of the appellant. On the contrary, our examination of it supports the constitutionality of the combination tax under review. The Supreme Court carefully pointed out that its conclusion was not in conflict with *Central Greyhound Lines, Inc., v. Mealey*, 334 *U. S.* 653, 68 *S. Ct.* 1260, 92 *L. Ed.* 1633 (1947), a case cited by that court in its *per curiam* opinion dismissing the appeal of the appellant from a franchise tax assessment wherein similar federal constitutional questions were raised. *Central Railroad Company of New Jersey v. Division of Tax Appeals, supra.*

The judgments are affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, WACHENFELD, BURLING and ACKERSON—6.

*For reversal*—None.