87 N.J. Super. 367 (1965)
209 A.2d 369
JACQUELINE McGILL, PLAINTIFF,
v.
COUNTY OF ESSEX AND BRENDAN T. BYRNE, ESSEX COUNTY PROSECUTOR, DEFENDANTS.
Superior Court of New Jersey, Essex County Court, Law Division.
Decided April 15, 1965.
*368 Mr. Edward G. D'Alessandro for plaintiff (Messrs. Friedman and D'Alessandro, attorneys).
Mr. William J. Straub for defendant County of Essex (Mr. Nicholas T. Fernicola, attorney).
Mr. Thomas P. Ford, Jr. for defendant Brendan T. Byrne, Essex County Prosecutor (Mr. Brendan T. Byrne, County Prosecutor of Essex County, attorney).
WHIPPLE, J.S.C. (temporarily assigned).
This matter is before the court on a complaint whereby plaintiff Jacqueline McGill moves for an order requiring that the County of Essex and its prosecutor return any and all monies taken *369 from the person of plaintiff on or about June 18, 1964. Although the county treasurer is not specifically named as a defendant in the complaint, this court will treat the matter as if he were joined. The county opposes these proceedings. The prosecutor did not take any position in the proceedings. The essential facts are as follows:
For approximately one week prior to June 18, 1964 the Newark police placed under surveillance the premises at 29 Cottage Street, Newark. Each evening, between 7:00 and 7:05 P.M., a man known to the police as a lottery operator carried a package into the house at 29 Cottage Street. On June 18, 1964 a search warrant was issued by a magistrate of the Newark Municipal Court, authorizing the police to search said premises in that there was reasonable cause to believe that certain slips, papers, etc., were being used in connection with the "crime of lottery and/or bookmaking and/or gambling." Later that day John Bennett and Daniel J. Cullinane, Jr., Newark detectives, went to search the premises. After a 3-4-minute delay they were permitted to enter. Present in the first floor apartment at the time of the detectives' arrival were plaintiff, who resided in the apartment, and a Daniel P. Haas, who lives at 830 South 11th Street, Newark. Upon seeing the detectives, plaintiff walked to her dresser to pick up a purse. Detective Bennett went over and took the purse, which plaintiff was reluctant to surrender. Bennett explained to plaintiff that they were police officers with a search warrant. Finally, the purse was opened by Bennett, who found $816.45 in cash. Bennett testified that "[i]n the middle of this was a slip which, from my experiences, showed me these represented codes handed in by what we call runners with the amount alongside each of the code numbers." Code numbers constitute a letter and two numbers, plus a cash figure, e.g., C 14 $100. Bennett testified to these facts at least three times on direct and cross-examination, and on each occasion his version of what he found was the same. Cullinane corroborates Bennett and confirms that a slip was found with the money in the purse.
*370 Bennett further testified that plaintiff told him that the $816.45 was her money, but he found her hesitant to explain further except that she did state, "I have saved that." Plaintiff does not contradict this conversation and, at the hearing, she elaborated on her earlier statement to Bennett by testifying that $250 was vacation pay and the rest she had saved, since she "had planned a vacation to Texas to join my husband" at Fort Bliss. Plaintiff also testified that there was no code slip in the purse on the dresser, but only $816.45 and personal belongings, thereby contradicting Bennett and Cullinane.
Upon a further search of the premises the detectives found $1300 on Haas ($1320 according to the police report), but this was not confiscated because the detectives saw "no connection" with the suspected lottery operation. Bennett and Cullinane also found one adding machine on the first floor and another on the second floor, together with adding machine tapes. On a night table next to a bed in plaintiff's apartment Cullinane found a second purse containing slips of paper which indicated to him that they were "tally sheets" or "rundown sheets" or "tapes" from an adding machine, with various figures indicated thereon. Plaintiff, at the hearing, denied ownership of the adding machines. She conceded there may have been one machine in the kitchen, but she stated that she did not know its purpose. She further testified that there was a bundle of Armstrong Racing Sheets in the living room, as well as two ledger books in the kitchen closet, and that the ledger books did not have the names of horses in them but only how they finished, i.e., first, second or third.
The testimony of Officers Bennett and Cullinane, summarized above, is credited. Any testimony by plaintiff at variance therewith is discredited. The testimony of both officers impressed me as truthful, straightforward, and that of disinterested parties. The crediting of both Cullinane and Bennett is predicated, in part, on my observation of their demeanor on the stand. As to plaintiff, I found her to be *371 evasive, often hesitant, and unworthy of belief. I specifically discredit plaintiff insofar as she claims that there were no slips but only the $816.45 and personal belongings in the purse picked up by Bennett. This discrediting is premised on the reasons set forth above, her demeanor, and the improbable nature of her testimony. Moreover, according to Bennett, plaintiff merely said, "I have saved that," when the money was taken from her; that plaintiff was hesitant in responding, and that she refused to discuss the matter further. It is indeed strange that plaintiff was so reluctant at the time of the arrest, whereas at trial she recited a careful explanation.
In resolving this credibility conflict I have considered the police report, prepared by Cullinane and read by Bennett, wherein it is stated that in the purse on the dresser was the $816.45, and that a tally sheet, tape, etc. were in the purse next to her bed. Hence, there is no mention in the report that the purse on the dresser which held the $816.45 also contained a code slip, although Bennett testified that the slip was in the middle of the $816.45. He was corroborated by Cullinane on this point. The court does not regard this minor inconsistency as dispositive. I am satisfied, based on my observation of the witnesses and a careful examination of the record, that the slip of paper with code numbers thereon was found with the $816.45 in the purse picked up by Bennett.
Both Haas and McGill were arrested for possession of lottery paraphernalia and conspiracy to operate a lottery. It was stipulated that the Essex County grand jury did not indict either Haas or McGill. The $816.45 has been retained by the county pursuant to N.J.S. 2A:152-7 which provides:
"Whenever any money, currency or cash shall be seized or captured by the police, constabulary or other officer in connection with any arrest for violation of or conspiracy to violate any gambling law of this state, the said money, currency or cash shall be deemed prima facie to be contraband of law as a gambling device, or as part of a gambling operation, and it shall be unlawful to return the said money, currency or cash to the person or persons claiming to own the same, *372 or to any other person, except in the circumstances and manner hereinafter provided."
Plaintiff moves for a return of the $816.45 pursuant to N.J.S. 2A:152-10, which reads in pertinent part:
"If the trial or other ultimate disposition of such charge or charges, indictment or indictments, result in an acquittal or other final termination of such proceedings in favor of the person or persons so arrested, as aforesaid, in connection with which arrest the said money, currency or cash was seized or captured, then the person or persons claiming to own the said money, currency or cash may within 2 years from the date of such acquittal or other final termination, in addition to any other remedy now provided by law, make application, on giving 10 days' prior notice thereof to the said county treasurer, to the county court of said county, for an order declaring such money, currency or cash to be the property of such person or persons, and ordering the same to be returned by the said county treasurer * * *."
Plaintiff contends, essentially, that the failure of the grand jury to indict her warrants a return of the monies seized, and that, in any event, the evidence demonstrates that the $816.45 was not a part of a gambling operation. Defendant argues that the statute creates a prima facie presumption which continues, irrespective of the grand jury's failure to indict, until plaintiff proves by a preponderance of the evidence that the $816.45 was not a part of the gambling operation.

I.
The first issue to be decided is whether the failure of the grand jury to indict plaintiff per se requires a return of the currency seized to plaintiff.
I find that the claimant has the burden of demonstrating that the $816.45 is not a part of a gambling operation, and this is so irrespective of the grand jury's failure to indict the claimant. This conclusion is predicated on both the statute and reasons of sound public policy. As Justice Wachenfeld observed in State v. Link, 14 N.J. 446 (1954):
"The statute was enacted to discourage and prevent unlawful gambling, and the courts will not construe an enactment in such *373 fashion as to charge the Legislature with deliberately rendering impotent the clear and unambiguously expressed intention of the whole act. Grogan v. DeSapio, 11 N.J. 308 (1953).
Assume the defendant, forewarned of an impending raid, flees the jurisdiction and thus escapes, but the authorities, pursuing the search warrant, find abundant and undisputed evidence of extensive gambling, including money required to pay off bets where the wheel of fortune gives a negative answer, plus other customary paraphernalia employed in such operations. Does it mean the fruits of the illicit gambling manipulation become immune from seizure and forfeiture simply because the violator was more nimble of foot than those cloaked with authority who sought to preserve law and order?
Before such a construction could be adopted, the wording would have to be positive, emphatic and unmistakable. A statute will not be construed contrary to the over-all purpose envisioned by the Legislature as it is discerned from the context of the entire mandate, and restrictions or limitations not specifically contained therein will not be added by judicial interpretation, especially if they are prejudicial to the public good.
The statute embodies a rule of evidence formulated to facilitate gambling prosecutions by constituting the money so captured as `prima facie to be contraband of law as a gambling device,' and its primary purpose is to deter gambling violations. The appellants' construction would culminate in easy and frequent evasions of the enactment adopted; would be a perversion of the legislative intent, and contrary to the usual rule of construction that legislation must be accorded a rational interpretation consistent with its manifest purpose. Grobart v. Grobart, 5 N.J. 161 (1950); Central R.R. Co. of N.J. v. Director, Division of Tax Appeals, 8 N.J. 15 (1951)." (14 N.J., at pp. 453-454; emphasis added)
Plainly, as demonstrated by the hypothetical case, our Supreme Court does not intend that gambling monies be immunized from forfeiture merely because the owner is not arrested or convicted.
Additionally, there is nothing in the statute which requires the currency to be returned merely because the grand jury has not indicted the claimant. Applying the principles enumerated in State v. Link, supra, at page 453, the construction proposed by plaintiff could not be adopted unless the wording of the statute was "positive, emphatic and unmistakable." The statute does not positively or emphatically or unmistakably require the monies to be returned to plaintiff solely upon a showing that she has not been indicted. Something more is required, that something being sufficient *374 evidence to satisfy the court that the money is not part of a gambling operation.
This conclusion is supported by the statute itself, which provides that "said money, currency, or cash shall be deemed prima facie to be contraband of law." In effect, a presumption is created. There is nothing in the statute to indicate that the presumption falls, or that the money is no longer prima facie contraband, merely because a grand jury fails to indict the owner of the confiscated currency. The Legislature intended to place the burden on the moving party to overcome the presumption that such money, when seized in connection with a gambling operation, is contraband of law. It is incumbent upon plaintiff to prove, by a preponderance of the evidence, that the money was not a part of a gambling operation, especially in view of the circumstances testified to by the detectives of the City of Newark.
Spagnuolo v. Bonnet, 16 N.J. 546 (1954), sustains this proposition. It is true that there the claimant's son was indicted, pleaded non vult, and was sentenced to State Prison, but the language of Justice Oliphant is applicable here:
"The 1941 supplement must be construed in pari materia with the basic section of the act, R.S. 2:178-7, now N.J.S.A. 2A:152-6, N.J.S.A., to which it was a supplement. The basic section in effect declared that all property used for gambling was contraband, and such property was construed to include all money earmarked and segregated as part of a gambling operation.
It is true that the statute, as supplemented, declares that `said money, currency, or cash shall be deemed prima facie to be contraband of law as a gambling device, or as part of a gambling operation.' This declaration of the statute was not and could not be intended to have the effect of leaving the legal title to such money in the gambler or player.
Money is the sine qua non of a gambling operation. To attempt to ascribe to the Legislature an intent to place money used in gambling in a different category for the purpose of seizure as contraband, from dice, roulette wheels, racing sheets, gambling tables, etc., based on a theory or an academic question as to where legal title to such money rests at a given moment, is an absurdity which we shall not impute to the Legislature.
The intention of the Legislature in making such a declaration is obvious. It was and is to establish a rule of evidence, by a prima facie *375 presumption to be used in the trial of the claim of property created by the act. Such presumption places the burden upon the claimant of coming forward with evidence to overthrow it. Such a presumption is not required for the forfeiture of dice, roulette wheels, etc., because such instruments of gambling speak louder than mere words. Further, for obvious reasons money cannot be destroyed and the state of New Jersey has not the constitutional power to destroy it. Such power is an incident of the federal power `to coin Money, [and] regulate the Value thereof, * * *.' Art. 1, sec. 8, U.S. Const.; Ling Su Fan v. United States, 218 U.S. 302, 31 S.Ct. 21, 54 L.Ed. 1049 (1910); 31 U.S.C.A. § 420, et seq.
The monies seized in this case are admittedly legal tender and the rule is that the taker, holder or finder, in good faith or by law, of money has a good title thereto against the whole world in the absence of proper and sufficient evidence to prove bad faith on his part. The County of Essex lawfully took possession of this contraband by virtue of the sovereign power of the State of New Jersey, and had good title to the money, from the date of the seizure to the confirming judgment of forfeiture, against the whole world including the owner, Edward Spagnuolo, * * *." (16 N.J., at pp. 558-559)
The question is concededly a close one, but the court finds that both the statute and sound reasons of public policy compel the claimant to demonstrate that the monies in issue are not part of a gambling operation, notwithstanding the fact that the grand jury has not indicted the claimant. To find otherwise would open the door to unparalleled and unprecedented abuses by the less responsible elements in the community.

II.
The question next to be resolved is whether plaintiff has sustained the burden of proof in overcoming the presumption that the monies in question were contraband, i.e., constituted a part of a gambling operation, or were earmarked or segregated for gambling purposes. It may be that the county has the burden of proving that the $816.45 was contraband, but this question will be resolved, infra.
After careful examination of the record, briefs and oral argument, I conclude that plaintiff has failed to sustain the burden of overcoming the prima facie presumption that *376 the money taken was an integral part of the gambling operation, or earmarked or segregated for gambling purposes. Assuming, further, that the burden of proof is on the county to establish that the confiscated monies were part of a gambling operation or earmarked or segregated for gambling purposes, I find that the county has established, by a preponderance of the credible evidence, that the $816.45 was an integral part of a gambling operation, or earmarked or segregated for gambling purposes. The facts need not be reviewed again. Suffice it to say, I am satisfied that the $816.45 was found with the code slip in the purse on the dresser. This fact, together with the other items confiscated, persuade me that the $816.45 was either a part of the gambling operation, or earmarked or segregated for gambling purposes.
The expression of Judge Sullivan in his dissenting opinion in State v. Sherry, 86 N.J. Super. 296, 306 (App. Div. 1965), is germane here, that is, "no court should be required to serve as paymaster of the wages of crime."
An appropriate order shall be submitted.